UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

STEPHEN HAGGERTY,

     Plaintiff,

   - against -

MIZUHO CAPITAL MARKETS
CORPORATION,

     Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

16 Civ. ___

COMPLAINT

PLAINTIFF DEMANDS A
TRIAL BY JURY

    Plaintiff Stephen Haggerty ("Haggerty" or "plaintiff"), by his attorneys, Vladeck,

Raskin & Clark, P.C., complaining of defendant Mizuho Capital Markets Corp. ("MCMC") alleges:

## NATURE OF CLAIMS

    1.  Haggerty was a highly successful trader for over twenty years for Mizuho

Bank, Ltd. ("Mizuho Bank") and then for four years with MCMC, a subsidiary of Mizuho Bank

(collectively, the "Mizuho entities").  He traded in fixed-income markets, specializing in interest

rate swaps, and consistently exceeded the financial goals that the Mizuho entities set for him.

Despite his success, Haggerty witnessed a pattern of the Mizuho entities favoring Japanese

employees at the expense of non-Japanese employees.  As a result of this favoritism, Japanese

employees gained positions at the expense of non-Japanese employees even when less successful

or qualified.

    2.  On information and belief, MCMC discriminated against Haggerty by

giving him a lower bonus for his 2015 performance than it gave to less successful Japanese

traders even though he had far exceeded his profit goals.  MCMC then fired Haggerty in August

of 2016 to make way for a less qualified Japanese employee.

3.     Haggerty brings this action to remedy discrimination on the basis of race and national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York State Human Rights Law, New York Executive Law § 290 et seq. (the "NYSHRL"), and the Administrative Code of the City of New York § 8-107 et seq. (the "NYCHRL"), and discrimination on the basis of race in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981").

<u>JURISDICTION AND VENUE</u>

4.     This Court has jurisdiction over plaintiff's Title VII and Section 1981 claims under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331, respectively.

5.     Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over plaintiff's NYSHRL and NYCHRL claims because these claims closely relate to the Title VII and Section 1981 claims, having arisen from a common nucleus of operative facts, such that all claims form part of the same case or controversy.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because MCMC does business in New York, New York and the acts of discrimination occurred in New York.

7.     Pursuant to Section 8-502(c) of the NYCHRL, plaintiff has caused to be served a copy of the Complaint on the City of New York Commission on Human Rights and the Corporation Counsel of the City of New York.

8.     Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on October 21, 2016, complaining of the acts of discrimination alleged herein.  On or about April 27, 2017, the EEOC issued plaintiff a notice

2

informing him of his right to sue under Title VII.   Plaintiff has thus complied fully with Title VII's exhaustion requirements.

PARTIES

9.      Haggerty worked for MCMC from October 2012 until his termination on or about August 4, 2016.  Haggerty resides in New York and worked in New York City.

10.     MCMC is a corporation organized under the laws of the State of Delaware with headquarters in New York City.

11.     At all times relevant to this litigation, MCMC was plaintiff's employer within the meaning of Title VII, the NYSHRL, and the NYCHRL.

FACTUAL ALLEGATIONS

Background

12.     Mizuho Financial Group is one of Japan's largest banks.  It holds over two trillion dollars in assets across its various subsidiaries and employs more than sixty-five thousand people world-wide.  It also controls both Mizuho Bank and MCMC.

13.     Mizuho Bank maintains multiple offices in New York and employs nearly 1,000 employees in the state.  Mizuho Bank's trading department, where Haggerty worked, primarily focused on providing liquidity to its corporate customers through trading in derivatives.

14.     MCMC is a wholly owned subsidiary of Mizuho Bank.

15.     Prior to October 2012, MCMC's primary business was trading in interest rate swaps with other financial institutions and Mizuo affiliates in order to set a price for those swaps and then hedging its risk through trades in the interbank market.  However, the passage of the Dodd-Frank Act in or around October 2012 forced Mizuho Bank to transfer its customer-

3

based trading department to MCMC. As result, MCMC expanded to almost 100 employees and dramatically increased its trading activity.

16.    Haggerty is white and was born in the United States.

17.    Haggerty received a Bachelor's Degree in Political Science from Siena College in May 1992.

18.    After college, he worked briefly at D.H. Blair & Co. as a broker assistant before joining Mizuho Bank in or around March 1993 as an employee in the derivatives operations section.

19.    In or around 1995, Haggerty was promoted to become an officer in the foreign exchange trading section. He was then promoted in or around 1997 to Assistant Vice President, and then in or around 2002 to Vice President.

20.    In or around October 2012, when Mizuho Bank transferred its customer trading operation, which Haggerty managed, to MCMC, Haggerty became an employee of MCMC, while remaining an employee of Mizuho Bank.

21.    In or around 2014, the Mizuho entities promoted Haggerty to Associate Director. In that capacity, he was responsible for managing MCMC's customer trading operations and overseeing a team of traders and support staff.

22.    Haggerty assisted with the transition of the trading department from Mizuho Bank to MCMC and helped to build up that department so that MCMC became a competitive player in the global derivatives market.

23.    Haggerty was very successful as a trader. He consistently exceeded his annual profit target. From 2013 through 2015 his profits were double the target that MCMC set for him.

4

24.    From the time Haggerty joined MCMC to the time of his dismissal, the trading portfolios he managed never suffered a single monthly loss and he earned MCMC a net profit of over $30,000,000.

25.    In or around January 2016, just eight months before Haggerty's dismissal, MCMC promoted him to head of the Global Rates Market Making Desk.

26.    As a result of Haggerty's promotion, he was responsible for overseeing all of MCMC's interest rate trades and hedging against any risks associated with those trades.

27.    Haggerty was also integral in creating and implementing the rules and regulations associated with the Dodd-Frank Act's "Volcker Rule" that came into effect in or around July 2015.  He was responsible for ensuring compliance with federal regulations and could have been held personally liable for any violations of those regulations.  The desk maintained an impeccable compliance record with all relevant regulations during his tenure.

28.    As head of the Global Rates Market Making Desk, Haggerty supervised a team of seven employees, five based in New York and two based in London.  This team consisted of traders and support staff.

29.    At the time of Haggerty's dismissal, the Global Rates Market Making Desk was on track to beat its 2016 profit target by more than fifty percent.  By that point it had already earned the Mizuho entities over $6,000,000 in net profit in 2016.  It was the most profitable trading desk in MCMC and, in fact, in 2016 it was MCMC's only profitable desk.

30.    Although Haggerty's new position came with the additional responsibilities described above, Mizuho did not give him a new job title and he remained an Associate Director.

833055 v1

MCMC Favors Japanese Employees and
Discriminates Against Non-Japanese Employees

31.    MCMC treated Japanese employees more favorably than non-Japanese

employees.

32.    MCMC originally brought Haggerty's most recent supervisor, Takehiko

Ariga ("Ariga"), to New York to fill the position of Chief Risk Officer at MCMC.  However,

MCMC filled that position before Ariga arrived.

33.    Rather than telling Ariga that there was no longer a position for him,

MCMC split up the position of Haggerty's then-supervisor, Sei Sano ("Sano").  Sano had been

head of Trading and Sales.  MCMC made Sano just the head of sales while Ariga became

General Manager and head of trading.

34.    Upon arrival, Ariga admitted to Haggerty that he had no experience

trading interest rates and no experience as manager of an interest rate trading group.  Ariga

acknowledged Haggerty's experience and proven track record of profitability in trading interest

rates and told Haggerty that he would have the freedom to run his desk at his discretion.  No non-

Japanese employee would be given as high a title or as much responsibility as Ariga despite

having so little experience.

35.    Japanese employees were rarely disciplined, let alone fired, even if they

performed poorly.  Non-Japanese employees, however, were subject to discipline and dismissal

for conduct that would not be punished if engaged in by a Japanese employee.

36.    Haggerty fielded a number of complaints about one Japanese employee

within his group who was so rude and abrasive that a number of MCMC employees refused to

work with him.  Haggerty spoke to the Japanese employee about this, but the employee's

behavior did not improve.  Haggerty therefore brought these complaints to Ariga's attention in or

6

around May 2016.  Ariga dismissed the complaints and took no action to address them.  Similar complaints against a non-Japanese employee would have received a firmer response.

37.     Another Japanese employee kicked a female employee because she did not complete a project before her vacation.  The Japanese employee was not fired.

38.     When Japanese employees performed poorly, they were not fired but instead transferred to a new position.  When a new position was not available, the Mizuho entities would create one, as they did with Ariga, or push out a non-Japanese employee to make room, as they did to Haggerty.

39.     A Japanese employee, Takayoshi Nakamura ("Nakamura"), was struggling in his position as head of the Treasury Desk.  As set forth below, instead of firing him or demoting him, the Mizuho entities essentially gave him Haggerty's position and then fired Haggerty.

40.     On information and belief, MCMC has fired at most one Japanese employee since 2011, but it has fired non-Japanese employees for poor performance and other reasons.

41.     MCMC pays more attention to Japanese employees and ignores non-Japanese employees.  When Ariga came to the trading floor, where Haggerty worked, he generally spoke only with the Japanese employees in Japanese and entirely ignored the non-Japanese employees.  This is the case even though Ariga speaks fluent English.

42.     This created awkward situations where Ariga discussed matters concerning the Global Rates Market Making Desk with Haggerty's subordinates but did not talk to Haggerty directly about such matters.  Haggerty was forced to ask his subordinates to fill him

in on their conversations with Ariga. Haggerty asked Ariga to speak with his team in English so everyone could understand, but Ariga continued to ignore all non-Japanese employees.

43.     This same pattern occurred whenever the President and Chief Executive Officer of MCMC, Masahiko Umemoto ("Umemoto"), visited the trading floor. He primarily interacted with Japanese employees, many of whom worked under Haggerty, and mostly ignored non-Japanese employees such as Haggerty.

44.     It was also common for upper management to hold meetings in Japanese with Japanese employees even though a number of senior employees who would otherwise attend those meetings could not speak Japanese. Those senior non-Japanese employees were not invited to these meetings, even when they were relevant to those employees' job responsibilities.

45.     In or around 2015, MCMC altered the compensation scheme for all employees within its trading division by making all bonuses entirely discretionary rather than based on a pre-determined formula tied to performance. MCMC employees in the sales division continued to be paid according to a pre-determined formula.

46.     Under this new discretionary bonus system, Umemoto was the final decisionmaker for all bonuses. On information and belief, MCMC used its discretion to award Japanese traders and members of the sales division higher bonuses relative to their performance than similarly-situated non-Japanese traders.

<u>The Mizuho Entities Discriminated Against Haggerty</u>

47.     Despite having worked for Mizuho for more than twenty years and taking on increased responsibility, Haggerty was treated worse than Japanese employees, including Japanese employees that were supposedly his subordinates. Ultimately, the Mizuho entities fired Haggerty despite his success as a trader and did not fire worse-performing Japanese employees.

8

48.     In or around 2015, the first year in which Mizuho adopted its discretionary bonus system, Haggerty received a bonus that was just thirty percent of the total he would have earned under the previous system.  It was about half his bonuses for the previous two years even though 2015 was his most profitable year ever; in 2015 he generated $12 million in profits.

49.     On information and belief, Japanese employees and members of the sales division did not experience such a steep reduction in their annual bonus.  This bonus reduction was unwarranted in Haggerty's case because he performed very well in 2015, doubling his annual profit target.

50.     In addition, at the end of 2015 MCMC evaluated Haggerty's performance as "meets expectations" even though he doubled his 2015 profit target and was on pace to beat his target in 2016 by more than fifty percent.

51.     In or around late April 2016, Ariga informed Haggerty that MCMC would promote him from Associate Director to Director.  Ariga told Haggerty that he deserved the promotion because of his impressive past performance and because he had taken over the Global Rates Market Making Desk in January 2016, which represented a large increase in responsibility.

52.     Ariga also told Haggerty that Nakamura, who was at that point the head of the Treasury Desk, would be promoted to the newly-created position of Deputy Business Head.  In this position, Nakamura would oversee the Global Rates Market Making Desk in addition to the Foreign Exchange Market Making Desk.

53.     Nakamura's promotion would add an extra layer of management between Haggerty and Ariga in MCMC's operational structure.  Ariga assured Haggerty that Nakamura's promotion would not affect Haggerty's job duties and that he was still being promoted.

9

833055 v1

54.    At the end of May 2016, Ariga told Haggerty that his promotion to Director, as well as Nakamura's promotion to Deputy Business Head, would no longer happen. Ariga gave no reason for this change in position.

55.    However, in or around June 2016, Ariga sent out a firm-wide email announcing Nakamura's promotion to Deputy Business Head.   Ariga also announced that MCMC was promoting a Japanese employee who was a member of Haggerty's staff to replace Nakamura as head of the Treasury Desk.   MCMC did not discuss or give Haggerty advance notice of the transfer of one of his staff members.   Ariga's email made no reference to Haggerty's promotion to Director.

56.    Upon receiving this email, Haggerty called Ariga and asked whether he would receive a promotion to Director.   Ariga stated that Nakamura's promotion was unrelated to Haggerty's and that Haggerty would not receive the Director title.

57.    On information and belief, MCMC shifted Nakamura away from the Treasury Desk because of his poor performance.   In particular, through August 2016, his desk showed an unrealized loss of over $75,000,000.   Rather than fire or demote Nakamura, MCMC created a brand new position for him as Deputy Business Head.   Nakamura, unlike Haggerty, had little experience with the sort of trades Haggerty conducted as head of the Global Rates Market Making Desk and a very poor track record of profitability.

58.    In addition, the Japanese employee from Haggerty's team who was promoted to head of the Treasury Desk had no experience with the trades that the Treasury Desk conducted.   The Mizuho entities overlooked more qualified, non-Japanese employees who had the required experience to run the Treasury desk.

59.    In or around June 2016, MCMC asked Haggerty to prepare a self-evaluation reflecting his performance in the first half of 2016.

60.    Haggerty accurately recounted his successes in his self-evaluation, including the fact that his desk was on track to beat its annual profit target by fifty percent and had already accrued a net profit of $6,000,000 that year.

61.    In or around early July 2016, Haggerty met with Ariga and human resources to discuss his self-evaluation only to find that MCMC had re-written it.  MCMC deliberately removed all references to his desk's profitability even though it was supposed to be a *self*-evaluation.  When Haggerty questioned the changes, Ariga told him not to worry about it and that it was not important.  Haggerty answered that profitability is the most important aspect of a trading desk.  Ariga responded that the review still said Haggerty "contributed to the success of the desk," which he deemed sufficient.

62.    At this same meeting, MCMC told Haggerty that his evaluation was "meets expectations" even though he had yet again beat the expectations that the Mizuho entities set for him.

63.    On or about August 4, 2016, the Mizuho entities terminated Haggerty's employment.

64.    Haggerty met with Ariga and Marie Chery ("Chery"), a Senior Vice President of Human Resources.  Chery told Haggerty that the Mizuho entities were looking to go in "another direction."  Haggerty asked her what she meant by this, but she gave no further explanation.  Haggerty then asked Ariga the same question, but Chery said that Ariga had been advised not to speak.  At the end of the meeting, Chery suggested that Haggerty hire an attorney.  Haggerty was forced to leave the building immediately and was not allowed to return to his desk.

11

833055 v1

65.     On or about August 4, 2016, MCMC also terminated the employment of two other employees, both of whom were not of Japanese origin or heritage.

66.     MCMC effectively replaced Haggerty with Nakamura. This is despite the fact that Nakamura has no relevant experience and performed poorly in his previous position. Haggerty, on the other hand, excelled at his job, achieving significant profitability for over two decades.

FIRST CAUSE OF ACTION
(Race and National Origin Discrimination: Title VII)

67.     Plaintiff repeats and realleges paragraphs 1 through 66 as if fully set forth herein.

68.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of employment on the basis of his race and national origin, including, inter alia, by paying a lower bonus and firing him on the basis of his race and national origin, in violation of Title VII.

69.     Defendant acted with malice and reckless indifference to plaintiff's rights under Title VII.

70.     As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

SECOND CAUSE OF ACTION
(Race Discrimination: Section 1981)

71.     Plaintiff repeats and realleges paragraphs 1 through 70 as if fully set forth herein.

12

833055 v1

72.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of employment on the basis of his race, including, inter alia, by paying a lower bonus and firing him on the basis of his race, in violation of Section 1981.

73.     Defendant acted with malice and reckless indifference to plaintiff's rights under Section 1981.

74.     As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

THIRD CAUSE OF ACTION
(Race and National Origin Discrimination: NYSHRL)

75.     Plaintiff repeats and realleges paragraphs 1 through 74 as if fully set forth herein.

76.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of employment on the basis of his race and national origin, including, inter alia, by paying a lower bonus and firing him on the basis of his race and national origin, in violation of the NYSHRL.

77.     As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

FOURTH CAUSE OF ACTION
(Race and National Origin Discrimination: NYCHRL)

78.     Plaintiff repeats and realleges paragraphs 1 through 77 as if fully set forth herein.

13

833055 v1

79.     By the acts and practices described above, defendant discriminated against plaintiff in the terms and conditions of employment on the basis of his race and national origin, including, underlined inter alia, by paying a lower bonus and firing him on the basis of his race and national origin, in violation of the NYCHRL.

80.     As a result of defendant's discriminatory acts, plaintiff has suffered and will continue to suffer irreparable injury, emotional distress, and other compensable damages unless and until this Court grants relief.

PRAYER FOR RELIEF

WHEREFORE, plaintiff respectfully requests that this Court enter a judgment:

(a)     declaring that the acts and practices complained of herein are in violation of Title VII, Section 1981, the NYSHRL, and the NYCHRL;

(b)     enjoining and permanently restraining these violations;

(c)     directing defendant to take such affirmative action as is necessary to ensure that the effects of these violations are eliminated and do not continue to affect plaintiff's employment opportunities;

(d)     directing defendant to place plaintiff in the position he would have occupied but for defendants' discriminatory treatment of him, and to make him whole for all earnings he would have received but for defendants' discriminatory treatment, including but not limited to, wages, pension, interest, and other lost benefits;

(e)     directing defendant to pay plaintiff compensatory damages for his mental anguish, emotional distress, humiliation, and damage to reputation;

(f)     directing defendant to pay plaintiff punitive damages;

(g)     awarding plaintiff pre- and post-judgment interest;

14

833055 v1

(h)     awarding plaintiff the costs of this action together with reasonable attorneys'

fees; and

(i)     granting such other and further relief as this Court deems necessary and

proper.

<u>DEMAND FOR A TRIAL BY JURY</u>

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, plaintiff demands a

trial by jury in this action.

Dated: New York, New York
      July 6, 2017

VLADECK, RASKIN & CLARK, P.C.

By:    _____

Anne L. Clark
Joshua Tarrant-Windt
Attorneys for Plaintiff
565 Fifth Avenue, 9th Floor
New York, New York 10017
(212) 403-7300

15

833055 v1